# OPERATING AGREEMENT
# OF
# MILK RIVER HUNTING PRESERVE, LLC

THIS AGREEMENT is made and entered into this 8th day of October, 2003, by and among Milk River Hunting Preserve, LLC, a Montana limited liability company (the "Company"), Kirk A. Scoggins, Christopher Travis, John Kevin Moore, and the other persons as are hereafter properly admitted as members of the Company (the "Members").

## ARTICLE 1 - DEFINITIONS

**1.1  Definitions.** The words and phrases set forth below shall have the following meanings as used in this Agreement:

(a)  **"Act"** - The Montana Limited Liability Company Act, Title 35, Chapter 8 of the Montana Code Annotated, as amended from time to time, and any reference to a specific provision of the Act shall be deemed to include any future corresponding provision of the Act.

(b)  **"Built-in Gains"** - Allocations pursuant to §704(c) of the Code taken into account in determining Tax Profits or Tax Losses, to the extent the allocations are attributable to the excess of the agreed value over the tax basis, both as shown on Exhibit A, of property contributed to the Company.

(c)  **"Built-in Losses"** - Allocations pursuant to §704(c) of the Code taken into account in determining Tax Profits or Tax Losses, to the extent the allocations are attributable to the excess of tax basis over agreed value, both as shown on Exhibit A, of property contributed to the Company.

(d)  **"Capital Account"** - The account maintained for each Member pursuant to paragraph 6.1.

(e)  **"Code"** - The Internal Revenue Code of 1986, as amended from time to time, and any reference to a specific provision of the Code shall be deemed to include any future corresponding provision of the Code.

(f)  **"Distributable Cash"** for a period means the amount of all cash receipts of the Company during the period (other than capital contributions, proceeds of borrowing, dispositions of investments and similar items ordinarily credited to principal under Montana fiduciary accounting principles), less the sum of the following to the extent paid or set aside by the Company: (1) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (2) all cash expenditures incurred incident to the normal operation of the Company's business; and (3) all reserves which a Majority in Interest deem reasonably necessary to the proper operation of the Company's business.

1


EXHIBIT 16

(g) **"Event of Dissociation"** - The death, removal, bankruptcy, or dissolution of any Member or occurrence of any event which terminates the continued membership of a Member in the Company.

(h) **"Majority in Interest"** - A combination of any Members who, in the aggregate, own more than 50% of the Units owned by all Members from time to time (but not transferees of Members who have not been admitted as Members).

(i) **"Person"** means an individual, a general partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal entity.

(j) **"Regulations"** - The Income Tax Regulations promulgated under the Code, as amended from time to time, and any reference to a specific provision of the Regulations shall be deemed to include any future corresponding provision of the Regulations.

(k) **"Tax Losses and Tax Profits"** - The net loss or income of the Company as reported by the Members for federal income tax purposes as to each taxable year or other period, calculated by (1) including all amounts allocated to all Members under §§702(a)(1) through 702(a)(8) of the Code, (2) increased by tax-exempt income, and (3) decreased by expenditures described in §705(a)(2)(B) of the Code.

(l) **"Transfer"** - Any sale, assignment, gift, exchange, distribution from any trust or estate, or any other transfer of Units whatsoever, whether voluntary or involuntary, direct or indirect, including without limitation the change of legal and beneficial title of any Units resulting from the death of any Member, any distribution of Units from an estate or trust to any beneficiary thereof, any change in beneficial interest of any trust in which the trustee holds legal title to Units, any mortgage, pledge or encumbrance of the Units, or any change of ownership of a corporation, limited liability company or partnership which is a Member

(m) **"Unit"** - An interest in the Company.

Certain other words and phrases are defined by the context in which they appear in the Agreement for the first time and those words and phrases shall have the same meaning where they subsequently appear in the Agreement.

### ARTICLE 2 - FORMATION OF THE COMPANY

**2.1** **Formation.** The Company was formed on October 8, 2003 upon the filing of the Articles of Organization of the Company with the Montana Secretary of State. The Members hereby admit each other and associate themselves together as Members of the Company upon the terms and conditions set forth in this Agreement. In the event of a

conflict between the terms and conditions of this Agreement and of the Act, the terms and conditions of this Agreement shall control to the extent permitted under the Act.

**2.2** **Effective Date.** This Agreement shall become effective when it has been executed by all of the parties and, once effective, it shall relate back to the time of filing of the Articles of Organization.

**2.3** **Purposes and Powers.**

(a) The Company may engage in any lawful business for which limited liability companies may be organized under the Act.

(b) The Company shall have any and all powers which are necessary or desirable to carry out the purposes and business of the Company, to the extent that the powers may be legally exercised by limited liability companies under the Act.

### ARTICLE 3 - MANAGEMENT

**3.1** **Management of Company Affairs.** The business and affairs of the Company shall be managed by it Members. Except as otherwise provided in this Agreement or by non-waivable provisions of the Act, each Member shall have full and complete authority, power and discretion to manage and control the business, affairs and property of the Company and to perform any and all other acts or activities customary or incident to the management of the Company's business. A Member's signature shall be sufficient to bind the Company, and no third party need inquire into the authority of the Member to bind the Company. The Members agree not to take action to bind the Company except in accordance with this Agreement.

**3.2** **Manner of Acting.** Each Unit held by a Member is entitled to one vote on each matter voted on by the Members. Except as otherwise provided in this Agreement, all decisions and actions required to be made or taken by the Members shall be made or taken upon the affirmative vote of a Majority in Interest. Any decisions or action required to be made or taken by the Members may be made or taken without a meeting if a consent in writing, setting forth the decision so made or action so taken is signed by Members having the requisite votes.

**3.4** **Meetings.** A meeting of the Members may be called at any time by any Member upon five days' prior notice to the other Members or upon a waiver of notice by all of the Members. Meetings of the Members shall be held at the principal office of the Company or at any other location agreed to by all of the Members. Members may participate in any meeting of the Members by means of a conference telephone or similar communications equipment, provided all Members participating in the meeting can hear one another.

**3.5** **Limitations on Authority.** Without the affirmative vote of a Majority in Interest, no Member shall:

(a) sell or otherwise dispose of any Company property, real or personal, other than in the ordinary course of business;

(b) mortgage, pledge or grant a security interest in any Company property;

(c) incur or refinance any indebtedness for money borrowed by the Company, whether secured or unsecured and including any indebtedness for money borrowed from a Member, if the indebtedness to be incurred or refinanced would exceed $10,000;

(d) incur any liability on behalf of the Company or make any single expenditure or series of related expenditures of Company funds in an amount which would exceed $10,000;

(e) construct any capital improvements, repairs, alterations or changes to any Company property if the amount required to be expended by the Company in connection with the same would exceed $10,000;

(f) lend Company funds to or cause the Company to guaranty or become surety for the obligations of another individual or entity;

(g) hire, adjust the compensation of or discharge any employee of the Company;

(h) select and retain accountants, attorneys and other advisers, consultants or independent contractors to provide services to the Company if the amount required to be expended by the Company in connection with the same would exceed $10,000; or

(i) compromise or settle any claim against or inuring to the benefit of the Company involving an amount in controversy in excess of $10,000.

**3.6** **Books and Records.** The Company shall keep or cause to be kept complete and accurate books of account and records of the Company's affairs. The books of account and records, together with a copy of this Agreement and any amendments hereto, shall at all times be maintained at the principal office of the Company. Any Member or any Member's authorized representative shall have the right at any time to inspect and copy from the books, records and other documents regarding the Company or its affairs during normal business hours upon reasonable notice to the Company.

**3.7** **Company Property and Bank Accounts.** Legal title to all Company property shall be held in the name of the Company. All receipts by the Company shall be deposited to and all disbursements and expenditures by the Company shall be made from bank accounts maintained by the Company in the Company's name. Withdrawals from the Company's bank accounts for Company purposes shall only be made by those individuals as may be approved from time to time by a Members.

**3.8** **Tax Matters Partner.** Pursuant to §6231(a) of the Code, Kirk A. Scoggins is hereby designated as the "tax matters partner" for the Company and is hereby authorized to perform, on behalf of the Company or any Member, any act that may be necessary to make this designation effective.

**3.9** **Accounting Conventions.** The Company shall keep its accounting records and shall report its income for income tax purposes on a calendar year basis using the method of accounting as a Majority in Interest shall decide.

**3.10** **Compensation.** The salaries and other compensation of the employees of the Company shall be fixed from time to time by a Majority in Interest, and no employee shall be prevented from receiving a salary by reason of the fact that the employee is also a Member.

**3.11** **Members Have No Exclusive Duty to Company.** The Members shall not be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in other investments or activities of the Members or to the income or proceeds derived therefrom.

**3.12** **Liability of Members.** The Members are not liable under a judgment, decree or order of a court, or in any manner, for a debt, obligation or liability of the Company.

**ARTICLE 4 - CAPITAL CONTRIBUTIONS AND ADMISSION OF MEMBERS**

**4.1** **Capital.** The capital of the Company shall consist of Units.

**4.2** **Initial Capital Contributions.** Upon execution of this Agreement, each Member agrees as the initial capital contribution of such Member to contribute cash in the amount specified in Exhibit A. The initial Members shall receive Units as shown on Exhibit A in exchange for their initial capital contributions.

**4.3** **Additional Capital Contributions.** No Member shall be required to make any capital contribution in addition to that Member's initial capital contribution. If a Majority in Interest decide that additional capital is required, each Member shall have the right, but not the obligation, to contribute the same proportion of the additional capital as the Member's Units bears to the total number of Units owned by all Members who exercise the right to contribute. The Company shall issue an appropriate number of Units in exchange for the additional capital contributions made by the Members.

**4.4** **Admission of Members.**

(a) Substituted Members. A transferee of Units (that is exempt from compliance with or that has acquired the Units in compliance with the Members' Agreement dated, _____, 2003, which is described

5

below in Article 7) may be admitted as a Member only after signing an acceptance, in a form satisfactory to a Majority in Interest, of all the terms and conditions of this Agreement

(b) <u>New Members</u>. A person may be admitted as a Member only after obtaining the approval of a Majority in Interest, making the required capital contribution in exchange for an appropriate number of Units and signing an acceptance, in a form satisfactory to a Majority in Interest, of all the terms and conditions of this Agreement.

## ARTICLE 5 - CAPITAL ACCOUNTS AND ALLOCATIONS

5.1 <u>Capital Accounts</u>. The Company shall maintain a capital account for each Member according to the Regulations under §704 of the Code ("Capital Account"). A Member's Capital Account initially shall be the agreed value of initial capital contributed by the Member as shown on Exhibit A.

Each Member's Capital Account shall be increased by the following:

(a) the amount of the Member's additional cash contributions (if any);

(b) the agreed value of the Member's additional contributions of property (if any); and

(c) the Member's share of Tax Profits excluding Built-in Gains and Built-in Losses.

Each Member's Capital Account shall be decreased by the following:

(a) the amount of cash withdrawals and distributions received by the Member;

(b) the agreed value of property distributions received by the Member; and

(c) the Member's share of Tax Losses excluding Built-in Gains and Built-in Losses.

If Units are Transferred, the portion of the transferor's Capital Account attributable to the transferred Units shall be added to the transferee's Capital Account (and subtracted from the transferor's Capital Account), together with any increase appropriate pursuant to an election under §754 of the Code. If there is a redemption or additional capital contribution, the Members may decide to revalue the Company's property according to the principles of §1.704-1(b)(2)(iv)(f) of the Regulations and maintain the Capital Accounts consistent with that revaluation.

5.2 <u>Allocations of Tax Profits and Tax Losses</u>.

(a) <u>Built-in Gains and Built-in Losses</u>. Built-in Gains and Built-in Losses shall be allocated to the contributing Members according to the principles of §704(c) of the Code and the Regulations thereunder. If a contributing Member has made a transfer of some part or all of the contributing Member's Units, a ratable portion of the Built-in Gains or Built-in Losses otherwise allocable to the contributing Member shall instead be allocated to the current owner of the Units.

(b) <u>Remaining Tax Profits and Tax Losses</u>. The Tax Profits and Tax Losses remaining after the allocations, if any, required by paragraph 5.2(a), shall be allocated to the Members ratably in accordance with their relative ownership of Units.

(c) <u>Authority to Vary Allocations</u>. A Majority in Interest may decide to vary these allocations to the extent necessary to comply with federal income tax laws.

## ARTICLE 6 – DISTRIBUTIONS

**6.1 Distribution of Distributable Cash.** The Company shall distribute the Distributable Cash of the Company to the Members within 90 days after the end of each calendar year or more often as a Majority in Interest decide.

**6.2 Distribution for Taxes.** If a Majority in Interest determine that distributions under paragraph 6.1 are insufficient to enable the Members to pay federal and state income taxes attributable to the Company in quarterly installments, then the Company shall make additional distributions as a Majority in Interest decide for that purpose.

**6.3 Other Distributions.** The Company may make other distributions with the approval of a Majority in Interest.

**6.4 Distributions Among Members.** Any distribution shall be made to the Members ratably in accordance with their relative ownership of Units.

## ARTICLE 7 – TRANSFERS, PLEDGES AND WITHDRAWALS

**7.1 Restriction on Transfers.** Units may not be Transferred to any person unless the Transfer is in compliance with the terms of the Members' Agreement dated _____, 2003, a copy of which is on file and may be reviewed at the Company's offices.

**7.2 Restrictions on Encumbrances.** Units may not be encumbered or pledged as collateral unless the encumbrance is in compliance with the terms of the Members' Agreement dated _____, 2003, a copy of which is on file and may be reviewed at the Company's offices.

7

**7.3** **Withdrawals.** No Member shall have the right to withdraw from the company by voluntary act.

## ARTICLE 8 - DISSOLUTION AND LIQUIDATION

**8.1** **Dissociation of a Member.** The business of the Company shall be continued after the occurrence of an Event of Dissociation if there is one or more remaining Members. The continuation of the business of the Company after the occurrence of an Event of Dissociation under this paragraph 8.1 shall not require any affirmative action on the part of the remaining Member or Members.

**8.2** **Dissolution.** The Company shall be dissolved upon the first to occur of the following:

(a) Expiration of the period fixed for the duration of the Company in the Articles of Organization; or

(b) Upon the written consent of Members owning more than 80% of the Units owned by all Members.

**8.3** **Dissolution Procedures.**

(a) On dissolution of the Company, a liquidator selected by the transferees owning more than 50% of the outstanding Units shall immediately commence to wind up the Company's affairs. The Members shall continue to share Tax Losses and Tax Profits during the period of liquidation in accordance with Article 5.

(b) Following the payment of or provision for all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the liquidator to set up cash reserves as he, she or it decides shall be reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining assets) of the Company shall be distributed, in cash or in kind or partly in each, to the Members as provided in Article 6.

(c) Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and the Member's capital contribution thereto and share of Tax Losses and Tax Profits thereof, and shall have no recourse therefor (upon dissolution or otherwise) against any other Member.

(d) Upon the completion of the liquidation of the Company and the distribution of all Company funds and other assets, the Company shall terminate and any Member shall have the authority to obtain Articles of Dissolution of the Company as well as any and all other documents required to effectuate the dissolution and termination of the Company.

**8.4** **Right to Distribution In Kind.** No Member shall have any right to demand or receive any particular property upon dissolution and termination of the Company or to demand the return of the Member's capital contribution to the Company. The property to be received by any Member upon liquidation of the Company shall be decided by the Company, except that no Member shall be required to accept a distribution in kind in excess of the Member's fractional interest in the Company (Units owned by the Member divided by total Units then outstanding) without the Member's consent.

## ARTICLE 9 - EXCULPATION AND INDEMNIFICATION

**9.1** **Exculpation.** No Member shall be liable to any other Member for "Good Faith Errors" (meaning mistakes of judgment or for losses due to the mistakes or to the negligence or bad faith of any employee, broker, adviser or other agent or representative of the Company, provided that the agent or representative was selected with reasonable care). Members may consult with legal counsel (subject to paragraph 3.6(h)) and shall have no liability for the consequences of any act or omission resulting from good faith reliance on the advice of the legal counsel. The exculpation provided in this paragraph 9.1 also shall apply to the agents, employees and other legal representatives of each Member.

**9.2** **Indemnification.** The Company shall indemnify and hold harmless each Member from and against any loss or expense incurred by reason of the fact that the Member is or was a Member of the Company, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided the loss or expense resulted from Good Faith Errors or from action or inaction taken in good faith for a purpose which the Member reasonably believed to be in, or not opposed to, the best interests of the Company.

## ARTICLE 10 - MISCELLANEOUS

**10.1** **Arbitration.** Any controversy arising out of or relating to this Agreement shall be settled by binding arbitration pursuant to the Montana Uniform Arbitration Act or other applicable Montana law, and where not inconsistent, in accordance with the Commercial Arbitration Rules of the American Arbitration Association now or hereafter in effect. If the Members are unable to unanimously agree upon the appointment of an arbitrator within 10 days of meeting to appoint an arbitrator, the arbitrator shall be appointed by the American Arbitration Association. The Members shall confer with the arbitrator and together shall decide upon a time and place for an arbitration hearing. The arbitrator's fees and costs shall be paid by the Company, unless the arbitrator determines that any Member has asserted an unreasonable position during the arbitration, in which event the arbitrator's fees and costs shall be paid by the Member who asserted an unreasonable position.

**10.2 Related Party Transactions.** The Company may obtain products or services from entities controlling, controlled by or under common control with any Member and pay the entities reasonable fees for the products and services.

**10.3 Notices.** All notices, offers and acceptances and other communications under this Agreement shall be in writing and shall be delivered in person, by facsimile transmission with confirmation, by overnight delivery service with receipt, or shall be deposited in the United States Mail, postage prepaid, by certified or registered mail, return receipt requested, to the Company or a Member, as the case may be, at the address set forth in Exhibit A, except that the Company or any Member may change the address by giving the other parties notice of the change of address. A notice shall be deemed received: (a) if by personal delivery, on the date delivered, (b) if by facsimile transmission, on the date confirmed, (c) if by overnight delivery service, on the date delivered and (d) if by mail, five business days after mailing.

**10.4 Attorneys' Fees.** Subject to paragraph 10.1, in the event of a default by the Company or a Member under this Agreement, the non-defaulting parties under this Agreement shall be entitled to recover from the defaulting party all costs and expenses incurred by the non-defaulting parties by reason of the default, including, without limitation, reasonable attorneys' fees and costs and court costs, whether those amounts are incurred with or without legal action.

**10.5 Benefits of Agreement.** Nothing in this Agreement expressed or implied, is intended or shall be construed to give to any creditor of the Company or any creditor of any Member or any other person or entity whatsoever, other than the Members and the Company, any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenant, condition or provisions herein contained, and the provisions of this Agreement are and shall be held to be for the sole and exclusive benefit of the Members and the Company.

**10.6 Integrated Agreement.** This Agreement constitutes the entire agreement of the parties. It supersedes any prior agreements, negotiations or understandings among them, and it may be amended only as provided in Article 11.

**10.7 Severability.** If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of its provisions to other persons or circumstances shall not be affected thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

**10.8 Further Assurances.** After execution of this Agreement, the Company and the Members shall execute, acknowledge and deliver any further documents and do any further acts as may be required to carry out the intent and purposes of this Agreement, including any documents and actions as may be necessary or advisable to comply with the requirements of law for the formation and operation of limited liability companies wherever the Company carries on its business.

**10.9  Binding Agreement.** This Agreement shall bind the executors, administrators, estates, heirs, assigns and successors of the parties hereto.

**10.10  Governing Law.** Montana law shall govern this Agreement and all questions arising hereunder.

**10.11  Headings.** The headings of the particular paragraphs or subparagraphs of this Agreement are intended for guidance only, and shall not be relied upon in the construction or interpretation of this Agreement, nor shall they restrict the scope of the particular paragraphs or subparagraphs to which they refer.

**10.12  Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all the counterparts shall constitute one and the same instrument. As used herein, "counterparts" shall include full copies of this Agreement signed and delivered by facsimile transmission, as well as photocopies of the facsimile transmissions.

## ARTICLE 11 – AMENDMENTS

This Agreement shall not be amended to change any Member's share of distributions without the consent of the Member. Subject to the preceding sentence, this Agreement may be amended upon the affirmative vote of a Majority in Interest; provided, however, that any provision in this Agreement setting forth a decision or action requiring the affirmative vote of Members owning a greater percentage of Units shall not be amended without the approval of Members owning sufficient Units for the making of the decision or the taking of the action. From time to time, the Members shall cause Exhibit A to be amended to reflect admissions and withdrawals of Members, Transfers of Units, capital contributions (including the tax basis and agreed value), redemptions of Units and changes in the addresses of the parties.

IN WITNESS WHEREOF, this Operating Agreement has been executed the day and year first above written.

        MILK RIVER HUNTING PRESERVE, LLC

_____
Kirk A. Scoggins, Member

_____
Christopher Travis, Member

_____
John Kevin Moore, Member

        "Company"

_____
Kirk A. Scoggins, Member

_____
Christopher Travis, Member

_____
John Kevin Moore, Member

        "Members"

## EXHIBIT A

### Initial Capitalization

| Members | Tax Basis | Agreed Value | Units Issued |
|---|---|---|---|
| Kirk A. Scoggins | $333.33 | $333.33 | 33 1/3 |
| Christopher Travis | $333.33 | $333.33 | 33 1/3 |
| John Kevin Moore | $333.33 | $333.33 | <u>33 1/3</u> |
| TOTAL | $999.99 | $999.99 | 100 |

For purposes of paragraph 10.3, the address of the Company is as follows:

MILK RIVER HUNTING PRESERVE, LLC
105 Baker Avenue
Whitefish, MT 59937